2022 IL App (2d) 210648
No. 2-21-0648
Opinion filed November 9, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>JUDITH GRANDT, | ) ) | Appeal from the Circuit Court<br>of Lake County. |
| Petitioner-Appellant, | ) ) ) | |
| and | ) ) | No. 96-D-1537 |
| LAURENCE J. GRANDT, | ) ) ) | Honorable<br>Stephen M. DeRue, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Brennan and Justice Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1     Petitioner, Judith Grandt, appeals the judgment of the circuit court of Lake County denying

her petition for enforcement of judgment and restitution. In her petition, Judith sought to treat the

disability pension of respondent, Laurence J. Grandt, as a retirement pension subject to division

by the terms of the parties' dissolution of marriage judgment and the marital settlement agreement

(MSA) incorporated therein. On appeal, Judith argues that, where Laurence is eligible to receive a

retirement pension, he should not be allowed to frustrate the intent of the MSA by claiming that it

remains a disability pension. We reverse and remand.

¶ 2                                 I. BACKGROUND

¶ 3     The relevant portions of the record reveal that, on May 21, 1997, the parties' nearly 20-

year marriage was dissolved. At the time of the dissolution, Judith was 46 years of age, was

employed as a route manager for a newspaper and as a babysitter and day care provider, and was earning approximately $12,000 per year. Laurence was 43 years of age, was employed as a firefighter with the Countryside Fire Protection District (District), and was earning approximately $62,000 per year. The parties had two children during the marriage, an 18-year-old attending college and a 14-year-old attending high school.

¶ 4 In the parties' MSA, they agreed that Judith would receive in maintenance $150 per month for 24 months, after which either party could file a petition to terminate the maintenance or to modify it based on the parties' financial circumstances. In addition, the MSA recited that there was "an affirmative obligation on [Judith] to be independently capable of obtaining employment or finances to meet her reasonable needs." The MSA also included a specific provision about the division of Laurence's pension from the District (pension provision):

"With respect to [Laurence's] pension with Countryside Fire Protection District, they will not honor a [qualified domestic relations order (QDRO)], therefore either a withholding order shall be placed against [Laurence] or he shall be directly ordered to pay [Judith] in accordance with a formula of 20 years of marriage over years of participation times one half, which shall be paid to [Judith] only in the event it is received by [Laurence] if it is paid to him as a pension benefit. [Laurence] shall make every effort to segregate the funds if possible, by having the Plan Administrator segregate those funds into the name of [Judith], or by direct payment to her as [Laurence] receives his funds. [Laurence] shall also make an effort to name [Judith], allowing her the surviving widow's award in the event of the death of [Laurence] prior to his receiving his pension benefits."

¶ 5 On February 17, 1999, Laurence filed a *pro se* motion seeking, among other things, the suspension of his child support and maintenance obligations. Laurence stated in the motion that he had lost his employment due to medical disability but was pursuing both workers' compensation

and an on-duty disability pension.[1] The parties entered an agreed order, suspending Laurence's obligations for 90 days or until he began receiving an on- or off-duty disability pension. The matter was continued by agreement until July 22, 1999, at which time the parties entered another agreed order setting a temporary child support amount.

¶ 6     On November 1, 1999, Judith filed a petition for rule to show cause, alleging that Laurence had not paid his share of the minor child's medical and educational expenses. On December 14, 1999, the parties entered an agreed order in which Laurence agreed to pay the medical- and educational-cost arrearage at the rate of $100 per week.

¶ 7     On September 12, 2000, Laurence filed a petition to terminate child support because the minor child had experienced an "emancipation event" as defined in the MSA in that he had been expelled from high school for truancy, would not be returning to school, and was working full time. On September 20, 2000, the trial court determined that the minor child was emancipated and terminated Laurence's obligation to pay child support for the minor child.

¶ 8     On May 1, 2001, the trial court entered a qualified Illinois domestic relations order (QILDRO) specifying that Judith was to receive her marital portion of Laurence's "retirement benefit *** when benefits become payable" or "on the date the retirement benefit commences." Also on May 1, Laurence filed his consent to issue the QILDRO. No further postdissolution motions appear in the record until February 25, 2020.

¶ 9     On February 25, 2020, Judith filed a petition for issuance of a QILDRO and for restitution. There were apparent notice issues, and, on June 12, 2020, the trial court ordered Judith to effect

---

[1] The record shows that, at 44 or 45 years of age at the time he incurred his disability, Laurence was not eligible to receive a retirement pension even though he had sufficient years of service.

personal service on Laurence, which appears to have been accomplished. On July 24, 2020, the court entered a default judgment against Laurence on the February 25, 2020, petition. On August 12, 2020, Laurence filed a motion to vacate the default judgment, and, on August 18, 2022, the court granted Laurence's motion to vacate. On September 2, 2020, Laurence filed a response to Judith's petition for issuance of a QILDRO and alleged that he had been receiving a disability pension from the District, beginning about a year after the dissolution judgment and "long before [he reached] retirement age."

¶ 10     The parties appear to have engaged in settlement discussions. The proceedings were continued, with the trial court recognizing that no settlement had been achieved and setting the matter for hearing. On March 29, 2021, on its own motion, the court dismissed Judith's petition for issuance of a QILDRO for being "insufficiently pled." The court also expressly invited Judith to replead her petition.

¶ 11     On April 22, 2021, instead of filing an amended petition, Judith filed a petition for enforcement of judgment and for restitution.[2] Judith alleged that the District, had a unified employee disability and pension plan under article 4   (titled "Firefighters' Pension Fund—Municipalities 5000,000 and Under") of the Illinois Pension Code (40 ILCS 5/4-101 *et seq.* (West 1996)) and Laurence, as an employee, was entitled to benefits under the pension plan. Judith alleged that, after the entry of the judgment of dissolution, Laurence was injured in the course of

_____

[2] Laurence characterizes the petition for enforcement of judgment as an unlabeled amended petition for issuance of a QILDRO. However, there appears to be no impropriety with Judith having submitted the petition for enforcement of judgment rather than an amended petition for issuance of a QILDRO, and Laurence did not pursue the issue in the trial court; instead, he has pointed it out for the first time on appeal.

his employment, stopped working for the District, and began receiving disability benefits. Judith alleged, on information and belief, that, at some point after Laurence had attained 50 years of age, Laurence had elected to retire, resulting in the conversion of disability pension payments into retirement pension payments, and that she was entitled under the judgment of dissolution to her marital portion of Laurence's retirement benefits. In count I, Judith sought enforcement of the pension provision, going forward. In count II, Judith sought to determine the date on which Laurence began receiving his retirement pension payments and the arrearage arising from that and she sought an order requiring Laurence to pay the arrearage.

¶ 12    On May 10, 2021, Laurence filed his response to the petition for enforcement of judgment. Laurence admitted that the District had a statutory unified employee disability and pension plan under the Pension Code but denied that he had elected to retire or that he had received retirement pension payments. Laurence also maintained throughout the response to the petition that he was receiving disability benefit payments and that, as a result, Judith was not entitled to any portion of his disability payments.

¶ 13    The trial court ordered the parties to prepare an agreed stipulation of facts, but the record does not show that any such stipulation was filed. The court set the matter for hearing, and the hearing date was continued. The record does not contain an affirmative indication of whether the parties argued Judith's petition before the court. On October 18, 2021, the court denied Judith's petition. In expressing its reasoning, the court stated that it had been guided by the Second District case of *In re Marriage of Belk*, 239 Ill. App. 3d 806 (1992), which it found helpful in analyzing the MSA. The court found the term "pension" in the MSA to be ambiguous but ultimately concluded from the MSA as a whole and the Pension Code that the parties intended the division of an age-related or retirement pension and did not contemplate the division of any disability pension benefits.

¶ 14    Judith timely appeals.

¶ 15                                II. ANALYSIS

¶ 16    On appeal, Judith argues that Laurence's receipt of a disability pension should not defeat her right to receive the agreed-upon portion of his pension benefits once Laurence had fully attained eligibility to retire. Judith argues that the weight of authority and the structure of the Pension Code support her contention. We begin by considering the standards that govern our review.

¶ 17                        A. Applicable Standards of Review

¶ 18    Review of the trial court's decision involves several aspects. First, we must look to the judgment of dissolution and the MSA incorporated therein. We must also interpret relevant and applicable provisions of the Pension Code. Finally, we must account for the effect, if any, of the procedural posture in the trial court on our review.

¶ 19    Turning to the standard governing the interpretation of the MSA, we first note that any marital settlement agreement is a contract and interpreted according to the rules and principles of contract interpretation. *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶ 51. Thus, our main objective is to ascertain and give effect to the parties' purpose and intent in entering the agreement. *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008). If the agreement's language is clear and unambiguous, it should be given its plain and ordinary meaning. *Id.* If, however, the language is ambiguous, the parties' intent must be ascertained by examining the facts and circumstances surrounding the formation of the agreement. *Id.* In either case, the interpretation of an MSA is reviewed *de novo* as a question of law. *Andres*, 2021 IL App (2d) 191146, ¶ 51.

¶ 20    Next, we consider our review of relevant provisions of the Pension Code. The cardinal rule of statutory interpretation is to ascertain and give effect to the legislative intent. *Rivtis v. Turan*, 2022 IL App (2d) 210489, ¶ 19. Legislative intent is best indicated by the language employed in

the statute, given its plain and ordinary meaning. *Id.* We review *de novo* the trial court's construction of a statute. *Id.*

¶ 21 Finally, the procedural posture below may also influence our standard of review, depending on whether the trial court evaluated witness testimony and credibility and made evidentiary findings. Here, Judith filed a petition seeking to enforce the judgment of dissolution and the incorporated MSA and Laurence filed an answer to the allegations in Judith's petition. It appears that the court resolved the petition on the merits and that its judgment was based on its interpretation of the MSA and the Pension Code, as needed, and it does not appear that any nondocumentary evidence was offered. Therefore, the issues resolved in the court's judgment presented questions of law, which are reviewed *de novo. Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). With these principles of review in mind, we turn to the issue presented on appeal.

¶ 22 B. Disability Pension Versus Retirement Pension

¶ 23 Judith argues that, at this point, Laurence's pension should be deemed equivalent to a retirement pension. Judith argues that the clear intent of the MSA was to allow her to receive her marital portion of Laurence's retirement pension and that to accept Laurence's claim to still be receiving a disability pension at the age of 66 (his age when she filed her original petition, for issuance of a QILDRO, in 2020) would frustrate the intent of the MSA.

¶ 24 Our starting point is the MSA. The MSA resolved issues of custody, maintenance, and the division of the marital estate. Regarding maintenance, the parties agreed that Laurence would pay $150 per month for 24 months. The parties also agreed that Judith had "an affirmative obligation" to become economically self-sufficient. The marital estate was divided unequally, with Judith receiving 60% of the marital estate and Laurence receiving 40%. Other assets identified specifically were mutual funds, Laurence's pension with the District, the marital residence,

automobiles, debts, attorney fees, the upcoming 1996 income tax filing, and the disposition of various other items. In particular, the MSA provided:

"With respect to [Laurence's] pension with Countryside Fire Protection District, they will not honor a [qualified domestic relations order (QDRO)], therefore either a withholding order shall be placed against [Laurence] or he shall be directly ordered to pay [Judith] in accordance with a formula of 20 years of marriage over years of participation times one half, which shall be paid to [Judith] only in the event it is received by [Laurence] if it is paid to him as a pension benefit. [Laurence] shall make every effort to segregate the funds if possible, by having the Plan Administrator segregate those funds into the name of [Judith], or by direct payment to her as [Laurence] receives his funds. [Laurence] shall also make an effort to name [Judith], allowing her the surviving widow's award in the event of the death of [Laurence] prior to his receiving his pension benefits."

¶ 25    When interpreting a contract to ascertain the parties' intent, we look to the language of the contract, keeping in mind that we must consider the contract as a whole, viewing each provision in light of the other provisions. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We cannot determine the parties' intent by looking at a provision in isolation or by looking at disparate, isolated portions of the contract. *Id.* If, after performing this examination of the entire contract, the language is clear and unambiguous, it will be given its plain, ordinary, and popular meaning; if, however, the language of the contract is susceptible to more than one reasonable meaning, it is ambiguous, and we may resort to extrinsic evidence to determine the parties' intent. *Id.*

¶ 26    Here, the trial court focused on the word "pension" in determining that the MSA was ambiguous, because "pension" could reasonably refer to a disability pension or a retirement pension. A disability pension is awarded to provide income replacement for a firefighter who, through injury or illness, is unable to perform the requirements of the position. See *Schurtz*, 382

Ill. App. 3d at 1126 (disability pay is meant to replace the injured recipient's income). A retirement pension is a pension based on the recipient's longevity and service. See, *e.g.*, 40 ILCS 5/4-109 (West 1996) (providing that the pension is a percentage of salary attained at retirement from service determined by years of creditable service). However, when looking at the language of the pension provision and its context within the MSA as a whole, the meaning of "pension" is clear and unambiguous, and the MSA itself is likewise unambiguous.

¶ 27    As an initial observation, the MSA does not reference "disability," "disability pay," "disability pension," "disability benefits," or any other similar term. Instead, the pension provision appears in the portion of the MSA dividing marital assets, and it provides that the pension shall be divided between Judith and Laurence according to the length of the marriage divided by the years of Laurence's service. The division of the pension will occur "only in the event [the pension] is received by [Laurence] if it is paid to him as a pension benefit." The provision further provides that Judith will be designated as the surviving widow should Laurence die before he receives his pension benefits. The right of a surviving widow to receive any pension benefits is tied to the condition precedent that the firefighter who dies is not receiving a disability pension. *Id.* § 4-114 ("[i]f a firefighter who is not receiving a disability pension *** dies," the surviving spouse will receive a pension). Finally, the MSA provided a relatively brief period of maintenance while Judith became economically self-sufficient, and this evidences an intention that Judith was not to receive a portion of Laurence's income beyond the maintenance period. It would therefore be contrary to the expressed intent of the MSA for Judith to now begin receiving a portion of Laurence's disability pension, which, as noted, is income replacement, not earned retirement benefits. Based on our consideration of the whole of the MSA and contextualizing the pension provision therein, we determine that the MSA is unambiguous and that the parties agreed to divide Laurence's

retirement pension only when he would begin to receive his retirement pension; the parties did not consider or intend that "pension" would include a disability pension.

¶ 28    Even though the MSA is unambiguous, its language does not address what happens when Laurence, despite receiving a disability pension, attains eligibility to retire. Judith argues that Laurence's continuing to receive a "disability" pension even though he is eligible to retire essentially elevates the form over the substance and serves only to frustrate the parties' clear intent to divide Laurence's pension, once he retired. In support, Judith cites *In re Marriage of Benson*, 2015 IL App (4th) 140682, for the proposition that a disability pension that is actually a substitute for a retirement pension will be treated as a retirement pension. Laurence, for his part, argues that the trial court was correct to follow *Belk* and attempts to distinguish *Benson*.

¶ 29    Before we approach the parties' contentions, we first note that Laurence argues that Judith has not provided a sufficient record on appeal, because she did not include the agreed stipulation of facts (*supra* ¶ 13). Generally, an incomplete or insufficient record gives rise to the presumption that the trial court acted in conformity with the law and with a sufficient factual basis for its findings. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). The failure to include the parties' stipulation is the only omission or lack in the record on appeal identified by Laurence. While it is true that Judith did not include the stipulation in the record, we cannot see how the inclusion of the stipulation would have any impact on our analysis. This case involves the interpretation of the parties' MSA, and we have determined that the MSA is unambiguous. Thus, even if the stipulation had agreed facts touching on the parties' intent at the time the MSA was executed, it would be irrelevant because we look to the four corners of the unambiguous agreement. See *Thompson*, 241 Ill. 2d at 441 (extrinsic evidence to discern the parties' intent may be considered only where the instrument is ambiguous). Moreover, the interplay between the Pension Code and the MSA

presents legal questions, which do not depend on any facts beyond those already contained in the record. *Foutch*, then, simply has no applicability under the circumstances of this case.

¶ 30    Turning to the parties' contentions on appeal, we begin with Laurence's argument and *Belk*. In that case, the parties agreed to divide the husband's police pension " 'when and at the time [the husband] withdraws any amounts from his pension plan or he is paid any benefits under said plan.' " *Belk*, 239 Ill. App. 3d at 807. Nine days after the entry of the dissolution judgment, the husband was injured in a non-duty-related accident and was thereafter unable to work. *Id.* The husband received disability benefits as a result. *Id.* The trial court considered whether the wife was entitled to a portion of the husband's disability benefits, and it determined that the disability benefits were similar to a retirement pension and should be treated the same as a retirement pension. *Id.* at 807-08.

¶ 31    On appeal, this court held that the provision dividing the "pension plan" was ambiguous, because it was susceptible to two reasonable meanings: the division of an age-related retirement pension only, or the division of any benefits received through the husband's pension plan, including disability benefits. *Id.* at 809. This court considered several key factors in reaching its conclusion. First, there was no reference to "disability." *Id.* Second, the wife was not receiving any part of the husband's monthly income through maintenance (and a disability pension is a substitute for monthly income.) *Id.* at 810. Third, to treat the husband's disability payments as divisible would be unreasonable because he would be receiving only a quarter of his monthly salary if the disability payments were divided, instead of the half he would receive if the disability payments were not divided (and this dovetailed with the second point, that the wife was not receiving maintenance or any part of the husband's monthly salary). *Id.* at 810-11. Fourth, the parties discussed the division of "retirement" benefits on the record. *Id.* at 811. Fifth, the Pension Code treated disability (salary derived only) differently from retirement (age and years of service

derived). *Id.* Sixth, the parties used the standard formula typically employed to divide a retirement pension. *Id.* at 812. Considering these factors, this court concluded that the parties intended to divide only the husband's retirement pension, not his disability pension. *Id.* We further observed that the husband could, at some future date, elect to receive a retirement pension. *Id.* at 813. We reasoned that there was no agreement regarding when the husband would retire or when the wife would be entitled to receive any of the husband's benefits. *Id.* at 814.

¶ 32    Laurence argues that we should follow *Belk*. He points out that the trial court was obligated to, and did, follow *Belk*.[3] While there is a decided similarity between *Belk* and this case, Laurence overlooks a key and dispositive distinction: the husband in *Belk* was not of retirement age at the time he was disabled, and the litigation followed hard on the heels of his accident, so there was no cause to examine under what circumstances, if any, could the husband be deemed to be evading his obligation to divide his retirement pension. In other words, *Belk* did not consider what would happen 25 years along, which is the precise circumstance in this case. As such, while *Belk* may have been helpful in interpreting the MSA at issue in this case (but *Belk* focused on two words rather than the entirety of the instrument, an approach we disagree with here), the fact that the pension recipient there was not, at the time of the litigation to enforce the dissolution judgment, eligible to receive a retirement pension significantly undermines any guidance we could draw from it.

¶ 33    Judith argues that we should follow *Benson*. In that case, the parties divorced in 1999, and the judgment of dissolution provided that the wife was granted a " 'one-half interest in [the

---

[3] Of course, whether the trial court was obligated to follow *Belk* is of no moment to our review, because we review the court's judgment, not its rationale. *City of Chicago v. Holland*, 206 Ill. 2d 480, 491 (2003).

husband's] retirement plan through [his employer, a fire department].' " *Benson*, 2015 IL App (4th) 140682, ¶ 5. In 2008, the husband was injured and began to receive disability benefits. *Id.* ¶¶ 6-7. At the time he was injured, the husband was eligible to retire and to receive a retirement pension. *Id.* ¶ 7.

¶ 34 At a hearing on the wife's petition to enforce the dissolution judgment, the husband testified that the parties had not agreed to an MSA and that the dissolution judgment was the product of a contested trial. *Id.* ¶ 11. The husband also testified that disability benefits were not mentioned during the divorce trial and that he received disability benefits, which he intended to continue to receive for as long as he was allowed. *Id.* The wife introduced evidence from the fire department's pension board, which characterized the husband's disability payments as a " 'pension benefit,' " and a document describing the husband's pension plan, which showed that the benefits through the plan included disability benefits. *Id.* ¶ 13. The trial court awarded the wife her marital portion of the husband's benefits. *Id.* ¶ 15.

¶ 35 On appeal, the husband argued that he was receiving disability, not retirement, benefits and that the judgment of dissolution did not address disability benefits. *Id.* ¶ 20. The court held that the wife was clearly entitled to her interest in the husband's retirement plan, but the question presented was whether it was reasonable to consider the husband's disability benefits as part of his retirement plan. *Id.* ¶ 24. The court noted that the husband was immediately eligible to receive retirement benefits at the time he began to receive his disability benefits. *Id.* ¶ 32. The court also noted that the husband did not intend to stop receiving disability benefits or elect to receive retirement benefits. *Id.* The court held that, while the benefits were labeled "disability benefits, they [were] essentially retirement benefits" because they served not as income replacement "but as a substitute for his retirement pension." *Id.*

¶ 36    Laurence offers two grounds on which to distinguish *Benson*. First, Laurence claims that *Benson* is distinguishable because the dissolution judgment was a court-prompted ruling, not an MSA. This offered distinction is risible. A trial court's order is reviewed as any written instrument, with an eye toward ascertaining and giving effect to the drafter's intent. *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, ¶ 28; *In re Knazze*, 259 Ill. App. 3d 410, 414 (1994). Thus, there would be no difference in the interpretation of a dissolution judgment dividing marital assets or an MSA dividing marital assets. Second, Laurence distinguishes *Benson* on the basis that the court in that case considered a physical exhibit about the husband's retirement plan to support its reading of the provision at issue and, here, we have no exhibits. Again, this offered distinction is a cosmetic difference, not a substantive difference. It says nothing about the quality or persuasiveness of the reasoning employed by the court. We therefore reject Laurence's claims of distinction regarding *Benson*.

¶ 37    We find that *Benson*'s reasoning is persuasive. Although there is a factual distinction, because Laurence was not eligible to retire at the time he began receiving disability benefits while the husband in *Benson* was (*Benson*, 2015 IL App (4th) 140682, ¶ 32), we do not believe that difference affects the central point that, at an age when Laurence is eligible to retire, his "disability benefits do not serve as income replacement, but as a substitute for his retirement pension." *Id.* Here, Laurence is also elevating the label of his benefits over the substance of what they represent: at his age, namely, beyond the threshold of eligibility to retire, the benefits are a substitute for a retirement pension. Accordingly, we choose to follow *Benson*, not *Belk*, and we hold that the trial court erred in failing to divide Laurence's pension according to the formula set forth in the MSA.

¶ 38    Our conclusion is bolstered by *Schurtz*, 382 Ill. App. 3d 1123. In that case, the parties executed an MSA dividing the husband's " 'accrued retirement pension benefits as of September 16, 1993, if, as, and when received by him.' " *Id.* at 1124. In 2004, the husband became disabled

and began receiving disability benefits. *Id.* The wife sought to divide the disability benefits according to the provision in the MSA, and the trial court granted the wife's petition. *Id.* at 1124-25. The appellate court reasoned that, when a disabled ex-husband is not eligible to receive retirement benefits, an MSA dividing retirement benefits should not be interpreted to grant the ex-wife a portion of the ex-husband's disability benefits. *Id.* at 1126. However, if the ex-husband is eligible to receive age-related retirement benefits and is receiving disability payments instead, the MSA dividing retirement benefits should be enforced to give the ex-wife a portion of the payments the ex-husband is receiving. *Id.* The court emphasized that "[i]t is not the label of the payments (*i.e.*, disability or retirement) that controls." *Id.* " 'To allow a technicality, *i.e.*, a disability benefit instead of regular retirement pay, to defeat the terms of the [MSA] could hardly have been the intention of the parties.' " *Id.* (quoting *In re Marriage of Marshall*, 166 Ill. App. 3d 954, 962 (1988)). The disability benefits the husband was receiving did not replace his income, but, instead, they served to replace his retirement pension. *Id.*

¶ 39    We believe that the reasoning of *Schurtz* applies with equal force here, notwithstanding Laurence's age when he became disabled versus the husband's age in *Schurtz*. As the *Schurtz* court reasoned, the label of the benefits should not be invoked to defeat the clear intent of the MSA to divide Laurence's retirement benefits when he became eligible to receive them. *Id.* Because Laurence was eligible to retire when Judith sought to enforce the MSA, his benefits were no longer serving as an income replacement but instead were replacing his retirement benefits. To hold otherwise would be to elevate the form over the substance, and this is strongly disfavored. *E.g.*, *Benson*, 2015 IL App (4th) 140682, ¶ 32; *Schurtz*, 382 Ill. App. 3d at 1126.

¶ 40    Laurence focuses on how the Pension Code treats retirement benefits differently from disability benefits. Specifically, Laurence relies on *Belk*'s treatment of a disability pension versus an age-and-service-related pension (*i.e.*, a retirement pension). See *Belk*, 239 Ill. App. 3d at 811-

12 (the Pension Code provides for two separate and distinct pensions: one for age and length of service, and the other for when a participant becomes disabled); see also 40 ILCS 5/4-109, 4-110 (West 1996) (age-related retirement pension and line-of-duty disability pension, respectively). The existence of distinct types of pensions, however, does not provide an answer to the question presented here—namely, what happens when the recipient of a disability pension becomes eligible to receive a retirement pension that he or she has agreed to divide pursuant to an MSA?

¶ 41    A close consideration of the structure of the relevant provisions of the Pension Code suggests the answer to the central question presented here. Section 4-109 deals with the age-related retirement pension. 40 ILCS 5/4-109 (West 1996). Section 4-110 deals with the line-of-duty disability pension. *Id.* § 4-110. Both types of pensions receive annual increases pursuant to section 4-109.1. *Id.* § 4-109.1. Specifically, subsections (b) and (c) provide:

> "(b) The monthly pension of a firefighter who retired from service with 20 or more years of service, on or before July 1, 1971, shall be increased, in January of the year following the year of attaining age 65 or in January 1972, if then over age 65, by 2% of the originally granted monthly pension, for each year the firefighter received pension payments. In each January thereafter, he or she shall receive an additional increase of 2% of the original monthly pension. Effective January 1976, the rate of the annual increase shall be 3%.

> (c) The monthly pension of a firefighter who is receiving a disability pension under this Article shall be increased, in January of the year following the year the firefighter attains age 60, or in January 1974, if then over age 60, by 2% of the originally granted monthly pension for each year he or she received pension payments. In each January thereafter, the firefighter shall receive an additional increase of 2% of the original monthly

pension. Effective January 1976, the rate of the annual increase shall be 3%." *Id.* § 4-109.1(b), (c).

¶ 42    Under the Pension Code, Laurence was eligible to receive his retirement pension when he attained the age of 60. Under section 4-109.1(c), Laurence, who is receiving a disability pension, began to receive an annual increase of 3% to his disability pension, which corresponds to the annual increase for the retirement pension. This suggests that, upon attaining eligibility to receive the age-related retirement pension, the disability pension is contemplated to become a substitute for a retirement pension and no longer functions as income replacement. Thus, structurally, the Pension Code provides a point at which the income replacement function of the disability pension transitions to a retirement pension substitute that receives an annual increase fully equivalent to the basic terms of the age-related retirement pension.

¶ 43    Even though *Belk* recognized that there are two types of pensions provided for recipients under the Pension Code, the structure of the applicable provisions in the Pension Code suggests that the Pension Code itself contemplated the potential transition from the income replacement of a disability pension to a substitute for an age-related retirement pension as the recipient continues to age. Laurence's reliance on *Belk*, therefore, is unavailing.

¶ 44    *Belk* and Laurence's argument fail to consider what happens as a disabled pension recipient ages and becomes eligible for retirement benefits, where the parties have agreed or have been ordered to apportion the age-related retirement benefits. In this void, we find *Benson* and *Schurtz*, along with the structure of the Pension Code, to be both instructive and persuasive. Laurence offers no substantial thoughts on this issue, and his attempt to distinguish *Benson* is unsuccessful, to say the least. Instead, Laurence focuses on the contract-interpretive aspects of *Belk* without considering the central issue here, which is what happens when benefits labeled as disability benefits stop functioning as income replacement and instead replace the recipient's retirement

benefits? That question is persuasively answered by *Benson*, *Schurtz*, and the Pension Code itself. Accordingly, we hold that the trial court erred in denying Judith's petition and reverse its judgment. Due to the court's erroneous judgment, the issue of when Laurence's disability benefits ceased replacing his income and instead transitioned into a substitute for his retirement pension was not litigated. We therefore remand the matter to the trial court to determine this question and for further proceedings as necessary consistent with our judgment here.

¶ 45                                    III. CONCLUSION

¶ 46     For the foregoing reasons, the judgment of the circuit court of Lake County is reversed and the cause remanded for further proceedings.

¶ 47     Reversed and remanded.

*In re Marriage of Grandt*, **2022 IL App (2d) 210648**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 96-D-1537; the Hon. Stephen M. DeRue, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew Kaplan, of Libertyville, for appellant. |
| **Attorneys for Appellee:** | Dwayne Douglas, of Douglas Law PC, of Bannockburn, for appellee. |