**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240183-U

Order filed February 19, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| KIMBERLY FIKEJS, | ) | Du Page County, Illinois, |
| | ) | |
|    Petitioner-Appellee/Cross-Appellant, | ) | Appeal Nos. 3-24-0183 |
| | ) | 3-24-0373 |
|    and | ) | Circuit No.  21-D-419 |
| | ) | |
| J. DAVID FIKEJS, | ) | Honorable |
| | ) | Robert E. Douglas, |
|    Respondent-Appellant/Cross-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Hettel and Justice Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court did not err in limiting certain evidence pursuant to Rule 219(c), in its application of the premarital agreement, or in its decisions concerning the classification and division of property, dissipation, maintenance, or attorney fees. Affirmed.

¶ 2    On February 8, 2024, the trial court issued an amended judgment of dissolution pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq*. (West 2022)). Respondent-Appellant, J. David Fikejs, appeals the trial court's underlying application of

the parties' premarital agreement, its evidentiary ruling pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002), its classification of marital versus non-marital property, and its resulting dissipation finding. Petitioner-Appellee, Kimberly Fikejs, cross-appeals, arguing, *inter alia*, that she was entitled to a greater share of the marital property and higher maintenance and attorney-fee awards. For the reasons that follow, we affirm.

## I. BACKGROUND

David and Kimberly married in 1997 and had four children. At the time of trial, David was 58, Kimberly was 56, and all four children were adults. The youngest two children were still in college. David was self-employed, earning income through financial trading and investments. Kimberly managed the household and raised the children.

### A. The Premarital Agreement

On April 24, 1997, the parties entered into a premarital agreement that both agree govern their dissolution. Section 3.4 set forth the agreement's purpose:

"[3.4] The parties agree that the purpose of this Agreement is to promote marital harmony and to discourage either party from seeking to obtain monetary benefits by an abandonment of the marital relationship, or to gain benefits from assets originally acquired before the marriage[.]"

Section 1.1 defined separate property as:

"[1.1] (a) All property or interests in property now owned by each party;

(b) Any other property acquired prior to the marriage;

(c) Property designated as separate or non-marital by subsequent written agreement of the parties;

2

(d) Property acquired by a party after separation of the parties or termination of the marriage;

(e) All non-marital property denominated as such by 750 ILCS 5/503(a), or any subsequent and similar provision of the Illinois Compiled Statutes;

(f) *Any and all of the earnings*, proceeds of sale and appreciation in value of the Separate Property as defined in this Section." (Emphasis added.)

¶ 8 Section 1.2, entitled "Dealing with Separate Property," informed the transfer of separate property during the marriage:

"[1.2] During the continuance of the marriage, each of the parties shall have the full right to own, control, and dispose of his or her Separate Property the same as if the marriage did not exist. During the marriage each of the parties shall have the full right to [sell] his or her Separate Property without the other party joining in such [sale], and the transfer of such Separate Property by either of the parties will convey the same title that the transfer would convey if the marriage had not existed, *unless this property is* gifted by title or *commingled with Marital Property as defined in Illinois Statutes*." (Emphasis added.)

¶ 9 Sections 3.1 and 5.1 contained general waiver provisions:

"[3.1] The Separate Property of each party shall be treated as non-marital property for all purposes, including the provisions of 750 ILCS 5/503, or any successor or comparable statute, and shall remain the Separate Property of such party, *free of any claim of the other party*.

* * *

[5.1] This Agreement is intended by the parties as a mutual waiver and release by each *in all right, title[,] and interest* to which he or she may now or hereafter be entitled

3

during the lifetime or at the death of the other party *to the Separate Property* of such other party by virtue of the marriage that is contemplated between the parties under the laws of the State of Illinois[.]" (Emphases added.)

¶ 10    Section 3.3 waived maintenance *only if* the parties were married less than four years.

¶ 11    Section 3.2 informed the disposition of non-separate property, *i.e.*, marital property. It provided that, if the parties do not reach an agreement within 90 days of the filing of a petition for dissolution, and if the parties have been married more than four years, then "the court shall divide all Non-Separate Property *in as equal a manner as possible* regardless of the respective contribution of the parties to such Non-Separate Property." (Emphasis added.)

¶ 12    The parties accept, by declining to argue otherwise, that section 503 of the Act in its present form is a successor or comparable statute to section 503 of the Act referenced in the premarital agreement. 750 ILCS 5/503 (West 2022); see also Pub. Act 89-462, Art. 2 § 298 (eff. May 29, 1996). The parties each attached a list of assets that they deemed separate property. The assets still existing as of trial that David claims to be separate property include:

| 1997 Separate Property | Alleged 1997 Value | 2023 Value |
| --- | --- | --- |
| FCNB Checking, account no. ***2 | $9,991 | $28,372 |
| FCNB MMA, account no. ***3 | $343 | $11 |
| Citibank Checking, account no. ***9 | $500 | $5,465 |
| Citibank MMA, account no. ***6 | $10,334 | $577 |
| *Morgan Stanley 9168/7284* | *$178,000* | *$620,963* |
| Morgan Stanley 3411 | $152,299 | $168,524 |
| Morgan Stanley IRA 3041 | $194,636 | $873,179 |
| Northwestern Mutual Life Ins. | $4,500 | $277,009 |

4

| | | |
|---|---|---|
| 97 Dodge Viper | $44,640 | $40,500 |

¶ 13    David also owned his own investment business, Fikejs Company. The premarital agreement provided that Kimberly would have a 50% interest in the company upon marriage.

¶ 14    B. Discovery and the Trial Court's Rule 219(c) Ruling

¶ 15    In this case, David pursued a theory that the majority of the funds flowing into certain bank accounts, the key account being 9168 (Smith Barney)/7284 (Morgan Stanley), as well as the investments, businesses, and assets purchased during the marriage from the funds in those accounts, were separate property. Kimberly contended that David was non-compliant with discovery requests to demonstrate the bases for each of his separate property claims, and, on January 5, 2023, she filed a motion *in limine* and for Rule 219(c) relief in the form of barring additional financial documentation. That motion alleged that the case had already been continued several times due to David's delay in responding to discovery requests. David kept his financial documents in a storage locker since the inception of the case and released them piecemeal, including 43,000 pages of documents after the deadline, which, in turn, included 31,000 pages of documents after David's deposition. David provided vague interrogatory answers concerning his theory of tracing premarital funds used to create new assets during the marriage. For example, in response to an interrogatory requesting that he submit the bases for each non-marital property claim, David answered that Kimberly should refer to the financial affidavit and look to each year-end statement of his various accounts. Answers such as this left Kimberly and her team to make sense of thousands of pages of documents, including the surprise that the 9168/7284 account had over $7 million in funds deposited into it and used for various purchases during the marriage.

¶ 16    Following the January 5, 2023, motion, the parties entered an agreed order that Kimberly would withdraw her motion without prejudice and that the trial dates would be continued with

discovery reopened until February 28, 2023.  On April 14, 2023, Kimberly again moved to bar additional financial documentation, as discussed below.  Kimberly sought an order barring David from presenting any testimony of his premarital claims and presenting any documents tendered after his November 2022 deposition.

¶ 17    At the hearing, David responded that, due to the waiver provisions of the premarital agreement, he did not believe that he had a burden to trace the funds that flowed through his premarital accounts.  In any event, he had offered, in December 2021, to place 40 boxes of financial documents that he kept in a storage locker in a conference room and allow Kimberly's team to go through them.  Kimberly's team declined that offer, deeming it unreasonable.  David acknowledged that he had not filed a certificate of completeness in response to Kimberly's discovery requests but explained that the process of tendering documents has been overwhelming. David accused Kimberly's team of not genuinely wanting to understand his tracing theory, arguing that they failed to adequately question him during the deposition.  According to David, he could, "if he ha[d] to," trace his non-marital claims going back 25-plus years.

¶ 18    On April 27, 2023, the trial court, relying on *In re Marriage of Barnett*, 344 Ill. App. 3d 1150, 1153 (2003), granted Kimberly's Rule 219(c) motion in part.  It barred David from submitting documents tendered after March 17, 2023, as opposed to the earlier date of November 2022 as requested by Kimberly.  In addition, it barred David from arguing that the report of Kimberly's forensic accounting expert, James Godbout, was incomplete, as any alleged incompleteness was due to David's failure to timely tender documents.

¶ 19                                C. Trial Testimony and Evidence

¶ 20    From late April to early August of 2023, the trial court conducted a 16-day bench trial. Godbout, John Basso (the Fikejs's accountant of over 20 years), David, and Kimberly were the only witnesses.

¶ 21                                    1. James Godbout

¶ 22    James Godbout testified consistent with his report and we draw from both his testimony and report in recounting the opinions that he provided. Godbout was a partner with Marcum, LLP. For approximately 20 years, his work has been related to matrimonial cases involving business valuation, forensic accounting, and asset tracing. Godbout has performed tracing analyses for clients who, like David, worked in the financial trading industry. Not every client has received a favorable report. For this case, Godbout reviewed approximately 60,000 pages of documents, including deposition testimony, tax returns, operating agreements of businesses owned by David, and account statements. He and his team accepted a fee of over $130,000 for their work.

¶ 23    Godbout performed an extensive tracing analysis of the assets that David claimed to be non-marital in an attempt to ascertain the source of those funds. His starting point was the list of non-marital property attached to the 1997 premarital agreement. The 1997 list did not contain account numbers. As such, Godbout gave David the benefit of the doubt that the institutions lined up, *i.e.*, the Citibank checking account in 1997, for example, is the Citibank checking account to which David refers in the instant claim. Even so, the tracing exercise was complicated by missing account statements and gaps in time. Godbout never received a tracing analysis from David to supplement or counter his own findings.

¶ 24    Of the approximately $4 million that David currently claimed was his non-marital property, Godbout was able to trace back approximately $1,065,000. Thus, in his view, these funds, which consisted largely of two IRA accounts and some vehicles, retained their non-marital status. The

7

remainder of the assets could not be traced to the non-marital assets listed in the premarital agreement. Many of the assets derived from businesses started with funds from the 9168/7284 account.

¶ 25        Godbout testified about the 9168 Smith Barney account. In April 1997, the account held approximately $178,000 in funds. In 2023, a related account referred to as the 7284 Morgan Stanley account held approximately $620,000 in funds. However, the 7284 account did not hold the same funds that the 9168 account had held at the time of the marriage. In April 1997, the $178,000 in funds consisted of a municipal bond worth $100,000, securities approximating $51,000, and $27,000 cash. In May 1997, one month after the marriage, the account experienced outflows of approximately $173,000. Neither the municipal bond, nor any of the original securities exist today. All of the securities existing in the 7284 account as of the time of his report were purchased during the marriage.

¶ 26        In May 2012, the cash and securities held in the 9168 Smith Barney account transferred into the 7284 Morgan Stanley account. Around this time, the Smith Barney and Morgan Stanley Banking institutions had merged. Despite this, Godbout did not believe that the 9168 and 7284 accounts were the same accounts. The 7284 account opened with a $0 balance and the 9168 account contemporaneously issued a separate statement.

¶ 27        Over the course of the marriage, approximately $5.3 million in checks, *i.e.*, cash, flowed into and out of the 9168 account. More than 50 deposits, accounting for approximately $2.56 million in checks, had unidentifiable sources. In reviewing David's deposition testimony, Godbout concluded that much of the $2.56 million in unidentified sources had "most likely" come by way of walking checks over to the Smith Barney branch and depositing funds, of which no accounting was made as to whether the funds came from passive or non-passive sources. It was Godbout's

understanding that non-passive income indicated personal efforts, which typically indicated marital income. Many of the other checks deposited into the 9168 account came from the Kessler Asher F12 clearinghouse account for David's trading activity, which Godbout considered non-passive income. According to Godbout, because cash is fungible, and because half of the funds coming into the 9168 account had unidentifiable sources to begin with, it became impossible to trace much of the property that David claimed as non-marital back to the non-marital property listed in the premarital settlement agreement. These trends continued when the funds from the 9168 account transferred to the 7284 account, bringing the total cash flow from $5.3 million to $7.9 million over the course of the marriage.

¶ 28    Regarding the above-referenced Kessler Asher F12 clearinghouse account, David deposited funds received from the traders that he backed with capital. David had business arrangements with four of these traders prior to the marriage, Lawrentz, T. Prince, Downs, and Farrall/TEG. Relying on Basso's tax classification, Godbout considered the income from these relationships to be non-passive. In Godbout's view, this meant that David had been actively involved in the business relationship. In any event, David's business relationships with the four traders ended within a few years of the marriage. David went on to enter into numerous other business relationships with traders during the marriage which also went into the Kessler Asher F12 account and then the 9168 account.

¶ 29    David claims to have deposited $1,185,651 in premarital assets into the 9168/7284 account that no longer exist and have been consolidated through their passage through the 9168/7284 account. These funds include the capital value of the four trader relationships established before the marriage totaling $549,000.

9

¶ 30      David started numerous businesses during the marriage in addition to the trader relationships using funds from the 9168/7284 accounts. In reviewing David's tax documents from 1997 to 2020, Godbout discovered that 36 of David's 56 businesses generated income that Basso had classified as non-passive. Godbout opined as to some of these businesses as follows.

¶ 31      David started New Millenium Global Investments (NMGI) in 1998, after the date of the marriage, with $255,000 that Godbout could not trace. In addition, between 2004 and 2017, the 9168/7284 account transferred $920,000 to NMGI. NMGI owns NM Farm and Timber, which is a non-operational farm in Minnesota. Godbout did not have documentation on the source of the funds to purchase the property. David started NM Oil and Gas in 2006 to invest in the oil and gas industry. Between 2006 and 2014, David placed $302,000 in checks from the 9168/7284 account into NM Oil and Gas. Further, real estate in Kentucky (yet to be appraised), Hiawatha Bank Stock (valued at $135,000), and a Jackson Annuity (valued at $136,142) were all purchased during the marriage with funds from the 9168/7284 account.

¶ 32      On cross-examination, Godbout agreed that he did not purport to interpret the premarital agreement or the Act. Rather, his main service was to trace assets. Godbout acknowledged that he did not initially realize that David was not claiming that certain businesses, like Fikejs Trading and Blackbird Holdings, were non-marital. However, this did not impact his tracing analysis.

¶ 33                                          2. John Basso

¶ 34      John Basso testified that he is a CPA and has a master's degree in taxation from De Paul University. He and his staff prepared the Fikejs family and business tax returns from 1997 to 2020. He classified each of David's business gains or losses as passive or non-passive. If the gains or losses were classified as non-passive, that meant that David had been actively involved in the business. Basso would have made the classification decision after he or his staff spoke with David

10

or a respective business partner. Basso would not have submitted a tax return that he believed had incorrect information. Basso classified income from the four traders with whom David had a business relationship prior to marriage as passive in 1997, but as non-passive in 1998-2000 (except as to Farrall/TEG in 1998).

¶ 35 On cross-examination, Basso agreed that there could be tax advantages to the classifications of passive or non-passive, depending on the circumstances.

¶ 36 3. David Fikejs

¶ 37 David testified to his education and career. In 1987, David graduated from the University of Texas with a degree in finance. After graduating, David began trading equity options as a market maker at the Chicago Board Options Exchange (CBOE). At the time of the 1997 marriage, he continued to be self-employed as a market maker, and he conducted his trading activities through Fikejs Company. In relation to his activities at CBOE, he had at one time received two Paul Revere disability insurance policies. However, he believed he had to be working at CBOE for them to be valid. In addition to his own activities at CBOE, he had backed four other traders with capital, Lawrentz, T. Prince, Downs, and Farrall/TEG. He had come to know these traders through his previous business endeavors and continued to strategize with them throughout their business relationship. After the marriage, he entered into new business relationships with other traders, as well as started other businesses and investments.

¶ 38 David ceased trading at the CBOE in 2011. Fundamental changes in the option trading market made it difficult, if not impossible, for floor traders like David to remain profitable—he lost $1.1 million in his last 14 months as a trader. He believed this was due to increases in competition and advances in technology. The markets became more accessible to non-traders. Further, with the onset of computer trading, floor traders were now competing against computer

systems run by mathematicians and professional programmers working for Wall Street firms with vastly greater capital. Between 2011 and 2022, David kept Fikejs Company operational merely for the purpose of securing medical insurance. He accessed income from what he believed to be his separate property to pay for living expenses. When his career at the CBOE ended, David took several accounting courses at the College of Du Page with the goal of sitting for the CPA exam. He later decided against taking the exam because he believed the material was beyond his ability. He has, nevertheless, worked part-time for Jackson Hewitt reviewing simple personal income tax returns. From this, he has earned less than $5,000 annually.

¶ 39    In 2012, David was diagnosed with multiple sclerosis, a non-curable and potentially disabling disease of the central nervous system. David has been able to manage his symptoms with regular infusions and, presently, does not believe himself to be incapable of working. Still, heat and stress cause flare-ups in his symptoms. He remains mindful that a serious flare-up or viral complication could quickly incapacitate him.

¶ 40    David testified to numerous assets that were later divided as marital property. Relevant here, David testified that, many years prior, he purchased a license to buy Bears season tickets. In his 2021 affidavit, he valued the license at $40,000. He had paid about $7,000 for the license. However, when it was announced that the Bears were moving to Arlington Heights, he believed the license had no value.

¶ 41    During Kimberly's case, David was asked about the source of the $2.56 million in funds that Godbout had been unable to identify or trace that had been deposited in the 9168/7284 account. He answered "I don't know" or otherwise failed to provide a clear answer when asked the source of the following transactions: $175,000 in January 2003; $100,000 in March 2003; $50,000 in October 2003; $75,000 in January 2004; $40,000 in November 2004; $40,000 in December 2004;

12

$100,000 in November 2005; $300,000 in November 2006 ("I don't recall exactly"; "I think NMGI"); $50,000 and $25,000 in April 2007; $100,000 in February 2008; $10,000 and $50,000 in April 2008; $10,000 and $10,000 in June 2008; $30,000, $10,000 and $120,000 in October 2008; $10,000 in December 2008; $10,000 and $15,000 in February 2009; $50,000, $5,000 and $80,000 in April 2009; $20,000 and $10,000 in September 2009; $125,000 and $10,000 in October 2009; and $100,000 in June 2010.

¶ 42    However, during his case, David testified that he remembered the sources of the unidentified funds in the 9168/7284 accounts. He had created a demonstrative exhibit 411, which the trial court did not allow into evidence. However, the trial court allowed David to look at exhibit 411 during his testimony to refresh his memory. Kimberly objected to even that use, reminding the court of its ruling *in limine* and noting that David appeared to be reading off exhibit 411 rather than having his recollection refreshed. Kimberly argued that this amounted to a "trial by surprise" and noted that Godbout had considered David's "I don't know" deposition answers—which he again repeated during her case in chief—in forming his opinion. The court noted that David could refer to supporting documents that had been tendered to Godbout, but that it was improper for him to testify to transfers on his self-created exhibit 411 that were supported by documents that had not been tendered to Godbout. After referring to exhibit 411, David's recollection was refreshed as to many deposits into 9168/7284. Many of these deposits were from the NMGI checking account or the Kessler Asher F12 account. David was of the view that the 9168 and 7284 accounts were the same account—in 2012 Morgan Stanley unilaterally changed the account number.

¶ 43    David agreed that the 9168/7284 accounts were, as he recounted in his brief, "at the center of all of his [s]eparate [p]roperty claims." Funds from the separate property activities eventually flowed through this account, including NMGI and all of its businesses and investments and

13

proceeds from the sale of a seat of the CBOE that had been in his name. David testified that the following did not pass through the 9168/7284 accounts: CBOE membership and revenue from Fikejs Company business activities, two trader investments by the name of Baker and Bower, and ownership interest in Blackbird Holding.

¶ 44 David formed NMGI to manage investments that he believed were non-marital. He funded it with his profits from 1997 from TEG Farrall, the 9168 account, and the Kessler Asher F12 account. David went on to back new traders with capital throughout the marriage. In his view, he did not put any personal efforts into these businesses. He met with each of the various traders 10 to 20 minutes per month. He met with two of the traders even less frequently, every three to four months or five to six months. NMGI also backed a company started by David through Fikejs Company called Blackbird Holdings with a partner, JT Lundy.

¶ 45 David testified about the New Millenium Timber farm. It was not yet operational, but David anticipated that cattle may graze on it. To date he had spent $984,427 on the farm, but he valued it at approximately $380,000. He built a barn, hired a farming consultant, and built a solar energy system, among other improvements.

¶ 46 David testified about the 1997 safety deposit box, indicating that he last visited the box in 2000. It contained the same gold coins and other items that it contained in 1997. Also, David loaned his oldest daughter $420,000 to buy a condominium out of the 3411 Morgan Stanley account.

¶ 47 Regarding the deterioration of the marriage, David first testified that he consulted a divorce attorney after Kimberly filed for divorce in March 2021. He then agreed that the evidence showed he had paid his divorce attorney in October 2019. Further, he opened a Tinder account (an online dating platform) in 2018.

¶ 48                                    4. Kimberly Fikejs

¶ 49          Kimberly testified to her education, career, and health. In 1989, Kimberly received a
bachelor of the arts from Indiana University and was thereafter hired as a manager for Neiman
Marcus in Oak Brook. In 1996, her salary had reached $50,000. At that point she was recruited
by Bloomingdales in Chicago, where her salary approached $70,000. In 1997, she voluntarily left
Bloomingdales because she was pregnant and had been diagnosed with a heart condition. She then
accepted a part-time job at the Judith Ripka jewelry store until the birth of the parties' first child
in 1998. From 1998 on, Kimberly undertook the role of homemaker and primary caregiver to the
four children while David worked long hours and often did not return home until 8 p.m. Kimberly
was responsible for paying the bills associated with the Hinsdale residence, purchased for
$900,000 in 1997. During the marriage, Kimberly suffered a multitude of health issues. In
addition to the heart condition, she had been diagnosed with spina bifida at birth. She had an
inoperable tumor on her spine. In 2017, she was diagnosed with esophageal eosinophilia. In 2020,
she was diagnosed with an ulcer, had foot surgery requiring pins, and osteoarthritis. She
anticipates needing a dual knee replacement.

¶ 50          Kimberly testified to the marital lifestyle. Up until 2010, the parties' household budget
was roughly $20,000 per month. The amount was not a limit—it was just what they happened to
spend. The parties also enjoyed a Chicago condominium and a modest vacation property in
Kentucky. They went on numerous coastal vacations in the United States and trips to visit colleges
for the children. Kimberly purchased high-end clothing for herself and the children, including
Lululemon and Gucci. David had never objected. In the mid-2010's David planned a stricter
budget, with each party receiving $7,500 per month to meet their expenses. In January 2021,

David reduced Kimberly's budget to $6,500 per month. Kimberly was not given any input in any of the household budgets.

¶ 51　　　　Kimberly testified to other instances of David's control of the finances. In 2016, David cancelled Kimberly's credit card without informing her in advance. Beginning in 2010, Kimberly repeatedly asked to see financial documents for Fikejs Company, as she was the company secretary and was required to sign the minutes. David never shared the documents. He did not allow her access to the trailer on their Kentucky property. He did not allow her access to the safe in the marital residence. Kimberly knew that David had purchased gold bars during the marriage, and she had given pictures of the same to her attorney, but the gold bars were missing.

¶ 52　　　　Kimberly had filed motions for attorney fees under sections 508(a) and 508(b) of the Act. 750 ILCS 5/508(a), (b) (West 2022). She also filed a motion for dissipation. These motions included allegations concerning David's dilatory discovery conduct and the deterioration of the marriage, recounted above. Further information about these motions is included below in the summary of the judgment of dissolution and in the analysis as is necessary to address the arguments on appeal.

¶ 53　　　　　　　　　　　　　D. Judgment of Dissolution

¶ 54　　　　On February 8, 2024, the trial court issued the appealed-from, amended judgment of dissolution. Among the changes from the original judgment not relevant here, the court attached a balance sheet from David's most recent financial affidavit for the sole purpose of valuing the assets listed therein, with some updated values, not for the purpose of adopting David's proposed classifications.

¶ 55　　　　The trial court found that Kimberly, Basso, and Godbout testified consistently and credibly. In contrast, the court found that David did not testify credibly, noting his "calculated manipulation

16

of document production." The court observed, among other points, that David claimed not to have consulted a divorce attorney prior to Kimberly's 2021 filing for divorce, but 2019 payments to his attorney showed otherwise. The court found that David "went to great lengths" to claim he was not actively involved in many of the businesses that he formed during the marriage, but his accountant had reported related income as non-passive.

¶ 56                                 1. Classification

¶ 57        The trial court classified the 10 assets that David had attached to the premarital agreement and continued to claim as separate property. Some of the values are drawn from Godbout's report, which we have added for context.

| 1997 Separate Property | Alleged 1997 Value | 2023 Value | Classification |
| --- | --- | --- | --- |
| FCNB Checking, account no. ***2 | $9,991 | $28,372 | Marital |
| FCNB MMA, account no. ***3 | $343 | $11 | Marital |
| Citibank MMA, account no. ***6 | $10,334 | $577 | Marital |
| Citibank Checking, account no. ***9 | $500 | $5,465 | Marital |
| *Morgan Stanley [9168]/7284* | *$178,000* | *$620,963* | *Marital* |
| Morgan Stanley 3411 | $152,299 | $168,524 | David's Separate |
| Morgan Stanley IRA 3041 | $194,636 | $873,179 | David's Separate |
| Northwestern Mutual Life Ins. | $4,500 | $277,009 | David's Separate |
| 97 Dodge Viper | $44,640 | $40,500 | David's Separate |
| Safety Deposit Box | $85,000 | $85,000 | Marital |

In classifying the safety deposit box as marital property, the trial court noted, *inter alia*, that the "acquisition [of its contents were] not traced to a marital source" and it would resolve doubt as to

17

the nature of the property with a marital classification. The Northwestern Mutual life insurance policy was subject to a $222,508 reimbursement to the marital estate, with the court noting that only $4,500 in payments were made with non-marital assets and the remainder was paid with untraced, post-marriage payments. Accordingly, the value of David's non-marital property was $1,136,704. In addition, the court agreed with David that approximately $417,000 of the $420,000 loan to his daughter came from the Morgan Stanley 3411 account, and David was entitled to pursue that loan repayment as his separate property. The value of Kimberly's non-marital property was approximately $341,500, consisting of approximately $138,000 in retirement accounts, $5,000 in two lots in Indiana, and $198,000 in jewelry.

¶ 58 As to the first three accounts, the trial court wrote that assets in the accounts were marital "pursuant to" Rule 219(c)(iii), (iv), and (v) due to David's failure to timely tender documents to Godbout. This language mirrored that submitted by Kimberly in her proposed judgment. The court then clarified that, even if it had not considered Rule 219(c), the assets in the first three accounts, as well as the fourth, were marital pursuant to: (1) section 1.2 of the premarital agreement, which recognized that the separate property was vulnerable to commingling; (2) case law, such as *In re Marriage of Henke*, 313 Ill. App. 3d 159, 167-69 (2000), and *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 355-56 (2005), which, in the court's view, "requires a marital classification where the [1997] balance was [comparatively low] after which multiple millions of dollars[,] [and/or significant funds] including those from marital sources[,] were added in and subtracted out of the account[s] during the parties' lengthy 24[-]year marriage."

¶ 59 The trial court classified as marital David's 1997 to 1999 earnings from the premarital partnerships in which David backed four traders (Downs, Lawrentz, T. Prince, and Farrell/TEG). The court noted that the Downs and Farrell partnership terminated in 1999. The court explained

18

that the earnings stemmed from David's personal efforts. For example, David engaged in 10- to 60-minute monthly conversations with each trader wherein they evaluated trades, capital, distributions, and taxes. When NMGI acquired the remaining trader LLC's during the marriage, the operating agreement provided that NMGI, meaning David, was responsible for the books and accounting, management and control, and financial decisions related to borrowing or raising capital.

¶ 60 The trial court classified as marital the 9168/7284 account. It again cited Rule 219(c)(iii), (iv), and (v), but it also ruled on the merits. The court explained that the accounts were marital whether the Morgan Stanley 7284 account was the same account as the Smith Barney 9168 account (per David), or whether David simply closed the 9168 account and transferred assets to the 7284 account (per Godbout). None of the assets existing in the 9168 account at the time of the marriage, including eight securities and one bond, exist today. The court accepted Godbout's theory that, almost immediately following the marriage, the original assets left the 9168 account and, over the next 24 years, $7.9 million transferred in and out of the 9168/7284 account. These funds were "used to buy securities in the account including marital income from personal efforts, *assets from unidentified sources*, assets from marital sources including NMGI and a CBOE seat acquired during the marriage with marital assets, funds from marital bank accounts, and assets from Fikejs Company." (Emphasis added.) The account activity included deposits, withdrawals, and the purchase of securities.

¶ 61 The court explained that, when classifying accounts, it must ignore the receptacle—the account itself—and instead examine the assets therein. *Mouschovias*, 359 Ill. App. 3d at 355-56. David, through his conduct, "incorrectly believed cash and securities deposited into an account held before marriage became non[-]marital property upon deposit." However, as Godbout

19

testified, the security assets existing in the 9168/7284 account, and the funds therefrom used to start a myriad of businesses and purchase assets during the marriage, could not be traced due to comingling of marital and non-marital assets "making them indistinguishable." As such, section 503(c)(1)(B) of the Act applied to transmute the alleged non-marital property to marital property, because each estate contributed to purchase newly created property, here securities within the account, in such a manner that the respective contributions lost their identity. 750 ILCS 5/503(c)(1)(B) (West 2022) ("[1](B) If marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection (c).") Moreover, because David was unable to trace the non-marital contribution by clear and convincing evidence, he had no right to reimbursement. *Id.* § 503(c)(2)(A) ("(2)(A). When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence[.]") In addition to the Act and *Mouschovias*, the court relied upon *In re Marriage of Davis*, 215 Ill. App. 3d 763 (1991) (commingled property transmuted to marital property).

¶ 62        Finally, the court chose to classify the Kessler Asher F12 account even though it no longer existed at the time of dissolution, explaining that the account was used to purchase assets during the marriage. The court determined the account was marital, because David never traced the funds that moved through it during the marriage. In April 1997, among other assets, the account held securities valued at $100,000 that were never identified. Subsequent securities were not discernable from the account statements.

¶ 63                                    2. Other Rulings

¶ 64        The trial court granted Kimberly's dissipation claim in part. It accepted Kimberly's testimony that the marriage began to break down in March 2016 and it determined that Kimberly made a *prima facie* showing of dissipation by David in the amount of $1,329,326. Of that, the court determined that David established that $269,389 in spending was for a marital purpose. The court ordered that David pay $529,968 to Kimberly, representing 50% of the remaining assets for which Kimberly had made a *prima facie* showing of dissipation.

¶ 65        The trial court divided the marital assets equally (50/50). As concerns the Bears seat licenses, the court awarded them to David and noted that David had testified that they had $0 value. It further ordered David to reimburse Kimberly 50% of the face value of the remaining Bears tickets from the 2023-2024 season. Beginning with the 2024-2025 season, David would be responsible for all costs and benefits associated with maintaining the seat license. The court did not award the two Paul Revere disability policies to either party, which David testified had no value since leaving the CBOE.

¶ 66        The court awarded Kimberly guideline maintenance for an indefinite term in the amount of $1,733 per month, after imputing an $86,000 salary to David and a $25,000 salary to Kimberly. See 750 ILCS 5/504 (West 2022). We discuss additional details of this award in conjunction with our analysis.

¶ 67        The court granted Kimberly's petition for attorney fees in limited part. It found, *inter alia*, that Kimberly had incurred $909,658 in attorney fees to date, of which $534,325 had been paid with marital assets and with the balance outstanding. David had incurred $1,061,561 in attorney fees to date, of which $508,153 had been paid with marital assets and with the balance outstanding. To "equalize" the marital estate for the pre-distribution of attorney fees the court ordered Kimberly

21

to pay David $13,086 and, pursuant to section 508(a), for each party to remain responsible for the remainder of their own attorney fees. See *id*. § 508(a). The court referenced an earlier ruling in which it had ordered pursuant to section 508(b) that David pay $9,000 due to fees incurred when he failed to reimburse a joint account. See *id*. § 508(b). It also awarded $34,595 in fees pursuant to section 508(b) for fees incurred for what it deemed "a needless increase in the costs of this litigation for a baseless non-marital claim."

¶ 68 Finally, the trial court made the following findings regarding college expenses for the two youngest children, one a senior and one a sophomore, both at out-of-state public universities. The parties have several college savings accounts totaling $105,000. In addition, David's parents have started college savings accounts for the children. The parties will cooperate to utilize these accounts. If the funds are exhausted, the remaining college costs will be born 1/3 by each parent and 1/3 by the child. If funds remain, they will be split equally by the parties. This applies to the accounts owned by David's parents to the extent they were funded with marital funds.

¶ 69                                    II. ANALYSIS

¶ 70 David appeals, challenging the trial court's underlying application of the parties' premarital agreement, its evidentiary ruling pursuant to Rule 219(c), and its classification of property. He also appeals the trial court's resulting dissipation finding, arguing that non-marital assets cannot be dissipated. Kimberly cross-appeals, arguing that she was entitled to a greater share of the marital property and higher maintenance and attorney-fee awards. She also raises arguments concerning particular assets.

¶ 71 The Illinois Uniform Premarital Agreement Act allows parties to waive or modify the rights they would have otherwise had under the Act. 750 ILCS 10/4(a)(3) (West 2022); *In re Marriage of Best*, 228 Ill. 2d 107, 117-18 (2008). A court may not invalidate a premarital agreement merely

22

because its enforcement results in a disproportionate allocation of assets. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 55. Here, the parties accept the validity of the premarital agreement and agree that they are bound by it.

¶ 72　　　　A premarital agreement is a contract, subject to the rules governing contract interpretation. *Id*. ¶ 108. The primary objective in construing an agreement is to ascertain and give effect to the parties' purpose and intent in entering into it. *In re Marriage of Grandt*, 2022 IL App (2d) 210648, ¶ 19. We look to the language of the contract as a whole rather than at single provisions in isolation. *Id*. ¶ 25. A court cannot modify an existing contract or add terms to which the parties did not assent. *Thompson v. Gordon*, 241 Ill. 2d 428, 449 (2011). There is a presumption against provisions that easily could have been included in a contract but were not. *Id*. Issues of contract interpretation are reviewed *de novo*. *Grandt*, 2022 IL App (2d) 210648, ¶ 19.

¶ 73　　　　　　　　　　　A. David's Arguments

¶ 74　　　　　　　　　　　1. Waiver

¶ 75　　　　David argues that the waiver provisions of the premarital agreement, set forth in sections 3.1 and 5.1, bar Kimberly from arguing that his separate property transmuted into marital property through commingling. Specifically, David asserts that section 3.1 "provides for a mutual waiver of 'all claims against the other party's Separate Property.' " The essence of Kimberly's claim, however, is that the property at issue is *not* separate property. She contends that it has been transmuted into marital property through commingling of funds creating a new asset. David also asserts that section 5.1 "provides for a mutual waiver and release by each 'in all right, title, and interest to which he or she may now or hereafter be entitled during the lifetime or at the death of the other party in and to the Separate Property of such other party by virtue of the marriage that is contemplated by the parties under the laws of the State of Illinois.' " This language, however,

23

merely sets forth the undisputed principle that, by entering into a valid premarital agreement, the parties establish that the agreement controls over the rights they may have otherwise had under the Act. *Best*, 228 Ill. 2d at 118.

¶ 76 Further, nothing in the premarital agreement expressly prohibits separate property from being transmuted into marital property. See *Thompson*, 241 Ill. 2d at 449 (there is a presumption against terms which could easily have been included in a contract but were not). To the contrary, other portions of section 3.1, not quoted by David, as well as section 1.2 of the premarital agreement, contemplate that David's separate property is subject to a transmutation claim. For example, section 3.1 of the agreement provides that the separate property is treated as non-marital property for all purposes, including provisions of section 503 of the Act. 750 ILCS 5/503 (West 2022). Section 503(c) of the Act, in turn, addresses transmutation through commingling. See *id.* § 503(c). Moreover, section 1.2 of the agreement provides that a spouse may lose the right to freely transfer separate property if it is commingled with marital property as defined in the Act.

¶ 77                                2. Rule 219(c)

¶ 78 We next address David's challenge to the trial court's pretrial discovery sanction pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2022). On a motion for sanctions for an alleged discovery violation, the trial court may enter orders as are just, including barring evidence. *Id.* § 503(c)(iv). We will not disturb a trial court's sanction absent an abuse of discretion. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 31. In determining whether the trial court abused its discretion, we consider: (1) the surprise to the adverse party; (2) the prejudicial effect of the witness's evidence; (3) the nature of the evidence; (4) the timeliness of the objection; and (5) the good faith of the party seeking to offer the evidence. *Id.* ¶ 32. The practice of answering interrogatories with vague responses and attaching documents not specifically described or

24

referred to in the answer is improper. *In re Blank*, 145 Ill. 2d 534, 549 (1991) (23 pages of unidentified documents was an improper discovery response); see also *Barnett*, 344 Ill. App. 3d 1150, 1152-53 (2003) (submitting "15 pounds" of discovery documents while acknowledging that the court would have to go through "a thousand pages of documents to reconcile this" was improper). The purpose of Rule 219 is to achieve timely and complete discovery, so, to the degree possible, the sanctions order should allow for discovery and a trial on the merits. *Barnett*, 344 Ill. App. 3d at 1153.

¶ 79    In our view, the trial court's ruling was mindful of the purpose of Rule 219(c) to effectuate discovery and showed consideration of the relevant factors. The court had already continued the trial several times due to David's delay in tendering financial documents. It did not take the extreme approach of barring David from testifying to his non-marital claims and even allowed documentary evidence tendered after his deposition. In balance, the court may have reasonably determined that David did not make a good-faith effort in tendering the documents or answering the interrogatories, where David made known his belief that the premarital agreement's waiver provision relieved him of the burden to trace the assets he claimed to be non-marital. David's argument at the hearing that Kimberly's team strategically avoided understanding his tracing analysis during his deposition rings hollow where David continued to answer "I don't know" in direct examination by Kimberly's counsel at trial. The court agreed with Kimberly that David's practice of tendering thousands of pages of documents, without a more detailed explanation for their purpose, was improper and prejudiced her ability to refute David's premarital claims. The court did not abuse its discretion in fashioning the Rule 219(c) sanction.

¶ 80    David also points to the language in the judgment of dissolution, arguing that the trial court improperly used Rule 219(c) not only to limit the evidence but also to classify the property. In the

25

judgment, the court wrote that several assets were marital "pursuant to" Rule 219(c)(iii), (iv), and (v). This includes the first three assets, *supra* ¶ 57, as well as the 9168/7284 account. Problematically, only section (c)(iv) pertains to the sanction requested by Kimberly and imposed by the court—barring evidence. Section (c)(iii) allows the court to bar the claim and section (c)(v) allows the court to enter a default judgment or dismiss the action—relief never requested by Kimberly or entered by the court. As noted by David, the court would not be permitted to bar the claim or enter a default judgment in the absence of a pending motion by Kimberly or an explanation for doing so. See Ill. S. Ct. Rule 219(c) (eff. July 1, 2002) (providing that the court's sanction must be "on motion" and that the court must "set forth with specificity" the basis for the sanction). In context, however, the trial court did not otherwise reference the sanctions of barring the claim or entering a default judgment, and in fact did not enter that relief. David's claim was not barred nor was there a default judgment—there was a trial. David was awarded over $1 million in separate property, following Kimberly's stipulation to her own expert's findings, plus the right to collect on a $417,000 loan. After citing Rule 219(c), the trial court discussed the evidence and explained, on the merits, why it found that the property at issue was marital.

¶ 81                                    3. Property Classification

¶ 82        We next address the merits of David's challenge to the trial court's classification of marital versus non-marital assets. David's brief focuses on the classification of the 9168/7284 account. Although Kimberly argues in support of several of the trial court's marital classifications, David did not individually address these assets. He conceded instead that many of them rose and fell with the court's classification of the 9168/7284 account, including NMGI, and "other LLCs," Hiawatha Bank stock, certain life insurance policies, and certain vehicles (none of which David separately addresses in the analysis portion of his brief). David tangentially argued against the

26

marital classification of the first four accounts listed, *supra* ¶ 57, as implicated in his Rule 219(c) argument that we have rejected. David does separately address the Kessler Asher F12 classification and the safety deposit box classification, and we address those classifications at the end of this portion of the analysis.

¶ 83 We will not disturb the trial court's classification of property unless it is against the manifest weight of the evidence. *Mouschovias*, 359 Ill. App. 3d at 356. A court's decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where its findings are unreasonable, arbitrary, and not based on the evidence. *Id.* Related, we defer to the trial court's credibility determinations, as it is in a superior position to observe the demeanor of the witnesses, determine the weight that their testimony is to receive, and resolve conflicts in the testimony. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 95.

¶ 84 Before the court distributes property in a dissolution proceeding, it must first classify the property as either marital or non-marital. *Henke*, 313 Ill. App. 3d at 166. There is a rebuttable presumption that property acquired after the date of the marriage is marital property regardless of its manner of title. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 670 (2008). The party claiming that the property acquired during the marriage is non-marital must prove his claim by clear and convincing evidence. *Id.* One way to do so is to prove, by clear and convincing evidence, that the new property was acquired in exchange for non-marital property. *Henke*, 313 Ill. App. 3d at 169. Any doubts are resolved in favor of finding that the new property is marital property. *Id.*

¶ 85 Section 503(c) of the Act instructs on commingling and transmutation of property:

"(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

\*\*\*

27

[1](B) If marital and non-marital property are *commingled into newly acquired property resulting in a loss of identity of the contributing estates*, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection (c).

(2)(A) When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. *No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence* or that was a gift. ***.

[2](B) When a spouse contributes *personal effort* to non-marital property, it shall be deemed a contribution from the marital estate, which shall receive reimbursement for the efforts if the efforts are significant and result in substantial appreciation to the non-marital property[.]" (Emphases added.) 750 ILCS 5/503(c)(1)(B), (2)(A) (West 2022).

¶ 86    *Mouschovias* and *Davis* illustrate these concepts. In *Mouschovias*, the husband opened money market and index-fund accounts prior to the marriage. *Mouschovias*, 359 Ill. App. 3d at 354. The evidence was unclear as to what funds the accounts contained prior to the marriage. *Id.* at 356. During the marriage, many transfers occurred, and some deposits came from the husband's checking account where his paycheck was deposited. *Id.* The appellate court determined that the funds in the account were marital. *Id.* at 354. It reasoned that, although the account had been opened prior to the marriage, it had become merely a receptacle into which the husband deposited marital funds. *Id.* "A party should not be allowed to defeat the fundamental concept that all property acquired during the marriage is marital property by opening a checking account in his name and placing a meager amount in that account before the marriage, then depositing all his

28

paychecks into that account after the marriage." *Id.* at 355. Thus, a rule solidified that, when classifying an investment account, the court must ignore the receptacle and consider the assets within the account. *Id.* at 354-56.

¶ 87 In *Davis*, the husband inherited approximately $540,000 from his parents in the form of cash, stocks, bonds, and other securities. *Davis*, 215 Ill. App. 3d at 767. A few years later, the husband deposited $340,000 in marital funds with the intention of obtaining higher interest rates before withdrawing those funds to pay expenses. *Id.* at 769. The deposited funds were not held in cash but, due to the structure of the account, were used to buy securities. *Id.* With only two exceptions, each of the securities that the husband had inherited had been sold. *Id.* However, the husband had been awarded those two securities as his non-marital property. *Id.* Setting aside those two securities, no distinction could be made between which of the funds from the original non-marital securities versus the marital securities had been used to purchase new securities. *Id.* The non-marital and marital funds were, therefore, commingled, and became a new asset created during the marriage. *Id.* The new securities, as well as property and assets purchased from funds withdrawn from the account during the marriage, were marital property. *Id.*

¶ 88 In this case, a primary basis for the trial court's classification of the 9168/7284 account is that Godbout was not able to trace $2.56 million in funds that passed through the account after the marriage. David does not argue for reimbursement for funds and assets associated with the 9168/7284 account; rather, he argues that *all* funds that have ever passed through the 9168/7284 account and all subsequent purchases from the 9168/7284 account are his separate property. Per *Mouschovias* and *Davis*, however, it was David's obligation to identify the source of those funds or trace which of the remaining identified funds were used to purchase which securities within the account, and which funds from the account were used to purchase which assets and businesses

29

from the account during the marriage. Failure to do so supports the trial court's determination that non-marital and marital assets within the 9168/7284 account were commingled into newly acquired property.

¶ 89        In any event, David's argument on appeal that he traced the source of the funds related to the 9168/7284 account does not meet this court's standard for a developed argument. The appellant generally has the burden of persuasion on appeal. *Yamnitz v. William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250 (1993). Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an argument "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." "A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may dump the burden of argument and research, nor is it the obligation of this court to act as an advocate." (Internal quotation marks omitted.) *Atlas v. Mayer Hoffman McCann*, 2019 IL App (1st) 180939, ¶ 33. "An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Rule 341(h)(7) and is, therefore, forfeited." *Id.*

¶ 90        David's brief argues:

> "[The trial court] ignore[d] evidence introduced by David that he in fact traced the source of funds for nearly every one of the 'no source' deposits identified in Exhibit 5 to Godbout's report to one of his Separate Property accounts. (See R. 1847-1890 V.1 and the trial exhibits referenced therein). In nearly every instance, David's testimony about the source of the funds for each of the various deposits was corroborated by financial documents he had produced to Kimberly during pre-trial discovery and that were admitted into evidence."

30

¶ 91    David references a portion of transcript that contains four pages of traditional transcript to one physical sheet, meaning he provided a citation encompassing 172 pages of traditional transcript. These pages encompass the portion of the trial where David used his self-made exhibit 411 that was not allowed into evidence to recall transfers that he could not recall during his examination in Kimberly's case. David asks this court to search for the exhibits referenced amidst 172 pages of transcript and does not otherwise explain how the exhibits supported his position. As Kimberly's *unopposed* motion granted by this court to add page numbers to the over 20,000 pages of exhibits observed, "pointing to a specific exhibit among [thousands] of pages is worthless for directing the court's attention to a specific document page." However, David has not done even this for the court. He has not provided the specific exhibit(s) in his brief, nor has he provided the document page(s) in the record.

¶ 92    Even if he could, David did not rectify this problem in his reply brief. His entire tracing argument in reply reads:

> "Kimberly's assertions in this [tracing] section of her brief were copied almost verbatim from the Godbout report. In so doing, Kimberly ignores the extensive evidence in the record tracing the source of funds David used to acquire assets during the marriage that he claims are his Separate Property under the terms of the parties' Premarital Agreement. Citations to David's testimony and the corroborating documents admitted into evidence are set forth in a version of the Amended Judgment balance sheet included in the appendix to David's initial brief at A465-A471."

¶ 93    The "version" of the amended judgment balance sheet on A465-A471 to which David refers is not a part of the amended judgment. That balance sheet provides a series of citations to the exhibit files, which David argues prove his case. Those exhibits, largely account statements,

31

are the same documents to which Godbout had access. From these, we cannot without more re-create a tracing analysis to counter Godbout's. Simply put, David's arguments in this regard are undeveloped such that they might properly be forfeited. *Atlas*, 2019 IL App (1st) 180939, ¶ 33

¶ 94 Forfeiture aside, the evidence supports the trial court's ruling. Within a month of the marriage, the 9168/7284 account became a mere receptacle. Godbout testified that, in April 1997, just prior to the marriage, the account held approximately $178,000 in assets. These assets consisted of: (1) a $100,000 municipal bond; (2) $51,000 in securities; (3) $27,000 in cash. In May 1997, the account experienced outflows of $173,000. Neither the municipal bond, nor any of the original securities exist today. The trial court determined that David mistakenly believed that the 9168/7284 account, and not the funds within it, were at issue. This view is substantiated by David's conduct and statements throughout the discovery process that he did not believe he had a burden to trace the funds contained in the 9168/7284 account. It is also substantiated by his conduct during Kimberly's case, when he answered "I don't know," to the source of large transfers. After reviewing some 60,000 pages of documents, Godbout opined that approximately $2.56 million in funds passing through the 9168/7284 account were untraceable. The court found Godbout credible. David points to flaws in Godbout's report, such as his initial failure to appreciate that David did not claim Fikejs Trading and Blackbird Holdings as non-marital property. However, when confronted with this flaw, Godbout testified that this did not affect his tracing analysis. The trial court did not disregard David's testimony—it found David not credible.

¶ 95 David's remaining arguments are unavailing. David does not dispute the general rule that income resulting from personal effort is generally part of the marital estate. Section 503(a)(8) of the Act provides that income from non-marital property remains non-marital property if it does *not* come from personal efforts. 750 ILCS 5/503(a)(8) (West 2022). Section 503(a)(7) provides

that income from non-marital property due to personal efforts is subject to a right of reimbursement to the marital estate, subject to section 503(c). *Id*. § 503(a)(7). Section 503(c), in turn, addresses commingling and provides that personal efforts are a contribution from the marital estate. *Id*. § 503(c)(2)(B).

¶ 96 David argues that the income deposited into the 9168/7284 account was not a result of his personal efforts in managing his businesses, including the four trader relationships developed prior to marriage as well as the new trader relationships and businesses acquired after the marriage. However, the trial court's finding to the contrary was supported by the evidence. This is not merely a question of accountant Basso's non-passive classification versus David's testimony that he spent only 10 to 20 minutes per month strategizing with each trader. The trial court did not find David credible on this point. Moreover, the court noted that the NMGI operating agreement, through which many of these business relationships flowed, provided that David was responsible for the books and accounting, management and control, and financial decisions related to borrowing or raising capital. David entered into business agreements with traders based on relationships he had cultivated over time.

¶ 97 David also argues that section 1.1(f) of the premarital agreement instructs that "any and all" earnings derived from separate assets are likewise separate assets and that all earnings must include income from personal efforts. However, the agreement does not otherwise define "any and all" earnings as inclusive of personal efforts. There is a presumption against provisions that easily could have been included in the agreement but were not. *Thompson*, 241 Ill. 2d at 449. In *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 521 (2001), for example, the premarital agreement used the language recommended in Illinois Forms Legal and Business provides draft language for premarital agreements that proposes such an inclusion. See 11A Ill. Forms Legal & Bus. § 36.20

33

Marital property-definition ("Any income, accretions (inclusive of accretions attributable to the personal efforts and labors of either party), conversions, substitutions, and/or replacement of nonmarital property are considered excluded from marital property under this agreement"); see also 11A Ill. Forms Legal & Bus. § 36.42 (Maintenance-For management of separate property) ("Any income, interest, dividends, rents, other revenue, and profits attributable to the personal services, skill, and efforts of a party in managing his, her, or their own respective separate property shall also be his, her, or their separate property"). The instant agreement, by contrast, did not specify that income from personal efforts remained separate property in contravention of the statute. More problematically, section 1.2, concerning the management of separate property not only fails to specifically include personal efforts, but it expressly provides that David's separate property is vulnerable to being commingled with Marital property *as defined in Illinois statute*. Also, section 3.1 provides that separate property is to be treated as non-marital property for all purposes, including the provisions of section 503 of the Act. Under section 503 of the Act, income from personal efforts is a contribution from the marital estate.

¶ 98        Ultimately, however, we reject David's personal efforts argument for the same reason we reject his general property classification argument—the trial court reasonably found that David failed to trace his pre-marriage funds by clear and convincing evidence. In his argument concerning personal efforts, David made no attempt to differentiate income or capital from the pre-marriage traders, the post-marriage traders, and other post-marriage businesses. For example, Godbout had noted that David claimed that $549,000 in capital from the four pre-marriage trader businesses went into the 9168/7284 account when those business relationships ceased operating in the late 1990's and early 2000's, but even this fundamental assertion is missing from David's brief.

34

¶ 99 Nor are we persuaded by David's argument that the 9168 account and the 7284 accounts are the same account, and the 7284 account is not a new account into which 9168 funds were transferred. David's argument ignores that the trial court expressly clarified that its finding did not depend on whether the accounts were the same or whether the funds were transferred.

¶ 100 David also challenges the trial court's classification of the Kessler Asher F12 account, arguing that the court did not refer in its ruling to a specific transaction of marital funds being deposited into the account. David's argument flips the burden of proof. The trial court found that David failed to trace the funds that passed through the account during the marriage, and further that he never even identified the securities that were initially in the account. David does not refute this finding. In any case, David does not dispute that the Kessler Asher F12 account, which no longer exists today, fed into the 9168/7284 account.

¶ 101 Finally, David argues that the trial court erred in classifying the contents of the safety deposit box as marital property. He notes that the 1997 premarital agreement listed the safety deposit box and valued its contents at $85,000. In our view, the trial court reasonably determined, *inter alia*, that David had not traced its *contents* to a non-marital source. There was no evidence, other than David's testimony which the trial court did not credit, as to what the contents of the box contained in 1997. We also observe that Kimberly had testified that gold that had been purchased during the marriage was missing, supporting a general inference that David exerted control over tangible valuables. The court reasonably resolved any doubt concerning the contents of the safety deposit box in favor of a marital classification, and the court's determination was not against the manifest weight of the evidence.

¶ 102                                    4. Dissipation

35

¶ 103    David next challenges the trial court's dissipation order to reimburse Kimberly $529,968. Dissipation is the use of marital property for the sole benefit of one spouse for a purpose unrelated to the marriage at a time that the marriage is undergoing an irretrievable breakdown. *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700 (2006). The party claiming dissipation must first make a *prima facie* showing that dissipation has occurred. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 216 (2009). Once the party alleging dissipation has made a *prima facie* showing, the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent. *Id*. If the party charged with dissipation cannot do so, the court will find dissipation. *Id*. We will not disturb a trial court's dissipation ruling unless it is against the manifest weight of the evidence. *Id*. at 217.

¶ 104    David first argues that the assets at issue were not capable of being dissipated, because they were non-marital property. This portion of David's dissipation argument failed when we affirmed the trial court's property classification.

¶ 105    David also argues, in a single sentence, that the trial court erred in finding that the marriage began undergoing an irreconcilable breakdown in March 2016. David does not suggest an alternate date, though, consistent with his testimony, he presumably favors the March 2021 date on which Kimberly filed for divorce. "Dissipation is to be calculated from the time the parties' marriage *begins* to undergo an irreconcilable breakdown, not from a date after which it is irreconcilably broken." (Emphasis added*.) In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 375 (2008). Facts that may support finding the beginning of an irretrievable breakdown include the cessation of a sexual relationship; the absence of attempts to reconcile; *keeping finances at arm's length*; and declining to share childrearing responsibilities. *Id*.; see also *In re Marriage of Hazel*, 219 Ill. App. 3d 920, 922 (1991) (absence of attempts to reconcile). If there is no evidence to

support the beginning of an irretrievable breakdown, the court is to use the date on which the parties separated or filed for divorce. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 86.

¶ 106    In this case, the court found credible Kimberly's allegation that the marriage began to irretrievably breakdown in March 2016. This finding was reasonable, given that Kimberly testified that, around that time and even prior thereto, David kept finances at arm's length. Correspondingly, the court reasonably rejected the March 2021 date to which David testified, given that David opened a Tinder account in 2018 and began paying his divorce attorney in 2019.

¶ 107    David next argues, again in conclusory fashion, that his "response, testimony, and the supportive exhibits illustrate that much, if not all, of the dissipation was used to purchase or maintain assets that were subsequently divided as marital property." David cites without further discussion or delineation to a 44-page portion of his testimony (11 sheets of paper, with 4 traditional transcript pages on each page). Many of these pages consist of David simply testifying that he believes the expenses at issue pertain to his non-marital property. David also testified to expenses associated with his Minnesota farm, but the evidence did support dissipation as to that property, where David elsewhere testified that he invested nearly $1 million in the property, but valued it at $380,000, and still had not commenced farming operations. David has not persuaded us that the trial court's findings were against the manifest weight of the evidence.

¶ 108                                B. Kimberly's Arguments

¶ 109                            1. Distribution of Marital Property

¶ 110    Kimberly argues that the trial court abused its discretion in awarding the marital assets equally (50/50). A trial court's distribution of property is reviewed for an abuse of discretion. *Henke*, 313 Ill. App. 3d at 175. A trial court abuses its discretion only where no reasonable person

37

would have distributed the property in the same manner as the trial court. *Id.* Here, however, the premarital agreement addressed the division of marital property, and the trial court's interpretation of that agreement is reviewed *de novo*. *Grandt*, 2022 IL App (2d) 210648, ¶ 19.

¶ 111    Kimberly argues that she was entitled to a greater share of the marital assets because the value of David's non-marital assets was greater. However, section 3.2 of the premarital agreement provides that, as long as the parties' marriage was longer than four years, "the court shall divide all Non-Separate Property [*i.e.*, marital property] in as equal a manner as possible[.]" In other words, the agreement, to which Kimberly agrees she is bound, contemplated that, after the allocation of separate property, the marital property would be divided as equally "as possible." The trial court gave effect to this term and did not abuse its discretion in dividing the marital property equally.

¶ 112                                    2. Maintenance

¶ 113    Kimberly argues that the trial court's guideline, $1,733 monthly maintenance award was too low. She argues that the trial court did not adequately consider the length of the parties' marriage, the lifestyle enjoyed by the parties during the marriage, or the substantial non-marital assets awarded to David. She also challenges the trial court's imputation of income.

¶ 114    In issuing a maintenance award, the trial court first decides whether maintenance is appropriate by considering the factors set forth in section 504(a). 750 ILCS 5/504(a) (West 2022). In addition to any factor the court expressly finds to be just and equitable, these factors include each party's marital and non-marital property award, income, earning capacity, and needs, as well as the length of the marriage, the standard of living during the marriage, and any valid agreement by the parties. *Id.* If the court decides that maintenance is appropriate, it shall order maintenance in the guideline duration and amount, or it shall otherwise specify a reason for a deviation. *Id.* §

504(b-1). "When considering the statutory maintenance factors, income may be imputed to a party if it is found the party has become voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably refused to take advantage of an employment opportunity." *In re Marriage of Stine*, 2023 IL App (4th) 220519, ¶ 15. We review the trial court's maintenance award for an abuse of discretion. *In re Marriage of Harms*, 2018 IL App (5th) 160472, ¶ 24. To the extent a factual finding supports the maintenance award, it will not be reversed unless it is against the manifest weight of the evidence. *Stine*, 2023 IL App (4th) 220519, ¶ 16.

¶ 115    Preliminarily, we agree with Kimberly that the premarital agreement did not preclude a court's general consideration of David's non-marital property in awarding maintenance. Section 3.3 of the agreement waived maintenance only if the parties were married less than four years. Sections 3.1 and 5.1 of the agreement set forth a waiver of claims against any right, title, and interest in the separate property. Kimberly's request for maintenance is not a request for right, title, or interest in the separate property itself. To the extent there is any ambiguity on this point, we note that the agreement easily could have precluded any consideration of the separate property in awarding maintenance, yet it contained no such provision. See *Thompson*, 241 Ill. 2d at 449 (presumption against provisions that easily could have been included in a contract but were not).

¶ 116    We next summarily reject Kimberly's assertion that the trial court did not consider the length of the parties' marriage and the lifestyle enjoyed by the parties during the marriage. The court expressly held that it considered the length of the marriage both when deciding that maintenance was appropriate, 750 ILCS 5/504(a) (West 2022), and when determining that a maintenance term of indefinite duration was warranted. *Id*. § 504(b-1)(B). It also expressly referred to the parties' "lavish standard of living with multiple homes and properties" when deciding that maintenance was appropriate. *Id*. § 504(a).

39

¶ 117 Kimberly's primary arguments seem to be that: (1) the trial court's imputation of income, used to establish the maintenance amount, was an abuse of discretion and/or against the manifest weight of the evidence; and (2) its failure to adequately consider David's non-marital property award resulted in her suffering a disproportionate share of the lifestyle deficit necessarily resulting from the change in David's ability to earn income on the trading floor as well as his age and health. See *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 773-74 (1998) (if the marital lifestyle cannot be sustained, the lifestyle deficit should be borne comparably by each party unless other factors render that premise unreasonable); *cf. Heroy*, 385 Ill. App. 3d at 652-53 (upholding a significant maintenance award to the homemaker wife where the ability to sustain the marital lifestyle was not at issue).

¶ 118 The court's imputation of income to David was reasonable based on the evidence. The court's decision to impute an annual income of $86,000 was based on David's training as an accountant, with $86,000 being the average salary for an accountant in Illinois. The court appeared to credit David's testimony that his career trajectory had changed with the advent of technology that made it difficult for him to profit from a trading career. The court also expressly observed that David had an "uncontroverted medical condition," multiple sclerosis, which, at age 58, likely impedes his earning ability.

¶ 119 Similarly, the trial court's imputation of income to Kimberly was reasonable and based on the evidence. Its decision to impute an annual income of $25,000 approximated the salary of a person who worked 30 hours per week at a minimum-wage job. In setting this amount, the trial court undoubtably considered that Kimberly had been out of the workforce for over 25 years. When Kimberly left Bloomingdales in 1997, her salary was nearly $70,000. Accounting for inflation, Kimberly's 1997 salary is far higher than the $25,000 imputed to her today, indicating

40

the court's recognition that her earning potential was not what it had been. The court also recognized that Kimberly suffered from many serious health conditions. At the same time, the court was not required to find that Kimberly, at age 56, could not work at all. *Cf. Harms*, 2018 IL App (5th) 160472, ¶ 38 (declining to find that the 70-year-old spouse had the ability to become self-sufficient). The evidence showed that Kimberly had spina bifida since birth and the heart condition since her first pregnancy. Still, she had been the primary caregiver for four children, and she continues to travel.

¶ 120    As to whether the trial court failed to adequately consider David's non-marital property, we observe that that factor is to be considered both in deciding whether maintenance is appropriate and whether an upward deviation in the guideline amount is appropriate. 750 ILCS 5/504(a), (b-1) (West 2022). The court decided that maintenance is appropriate. It declined to give additional weight to that factor to grant an upward deviation from the guideline amount. The court also should consider any valid agreement between the parties. *Id.* § 504(a)(13). Section 3.4 of the premarital agreement provides that one of its purposes is to "discourage either party from seeking *** to gain benefits from assets originally acquired before the marriage[.]" We cannot say the court abused its discretion in allowing David to retain the income-generating benefit of the assets originally acquired before the marriage, rather than directing any portion of that income toward an increased maintenance award. Accordingly, we affirm the trial court's maintenance award.

¶ 121                                3. Attorney Fees

¶ 122    Kimberly challenges the trial court's limited grant of her petition(s) for attorney fees. Again, the trial court determined that each party would be responsible for his or her own fees. See 750 ILCS 5/508(a) (West 2022). However, it granted Kimberly $34,595 in fees pursuant to section 508(b) due to its finding that David's "baseless" non-marital claim "needlessly increased the cost

41

of litigation" and $9,000 due to its finding that David failed to comply with a reimbursement order. See *id*. § 508(b).

¶ 123 Generally, the party who incurred the attorney fees is responsible for the fees. *Heroy*, 385 Ill. App. 3d at 667. However, section 508(a) of the Act provides for attorney fee awards when one party lacks financial resources and the other party has the ability to pay. 750 ILCS 5/508(a) (West 2022); *Heroy*, 385 Ill. App. 3d at 667. In addition, section 508(b) of the Act provides for attorney fee awards when the other party has needlessly increased the cost of litigation. 750 ILCS 5/508(b) (West 2022). A court's decision to award attorney fees is reviewed for an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13.

¶ 124 The decision to order a contribution for attorney fees under section 508(a) is based on the criteria for the division of marital property and, if maintenance has been awarded, on the criteria for an award of maintenance. 750 ILCS 5/503(j)(2) (West 2022). Here, the trial court considered and made findings related to property division and maintenance, which we have affirmed. Its decision to divide the marital assets equally and allow David to retain the income-generating benefits of his separate property was consistent with the premarital agreement.

¶ 125 As to section 508(b), we observe that the trial court granted $34,595 in attorney fees in relation to David's non-marital claims. Kimberly argues that the trial court did not go far enough in sanctioning David for his failure to comply with discovery relating to the non-marital claims, but the trial court did, in conjunction with Kimberly's motion *in limine*, further sanction David by limiting the evidence he was permitted to tender. The trial court did not abuse its discretion.

¶ 126                                    4. Bears Tickets

¶ 127 Kimberly argues that the trial court erred in valuing the Chicago Bears seat license at $0 as part of its decision to award the license to David. "Specific findings of value *may* be required if

42

they are necessary to provide a basis for the trial and reviewing courts to determine the propriety of the property division; however, an apportionment in kind need not be accompanied by an exact [v]aluation." (Emphasis added.) *In re Marriage of Frederick*, 218 Ill. App. 3d 533, 544 (1991). In 2021, David valued the license at $40,000 in his financial affidavit. However, after it was announced that the Bears would be moving to Arlington Heights, David amended his financial affidavit to value the license at $0. The trial court appeared to accept this subsequent valuation, or at least to accept that the move to Arlington Heights would decrease the value of the license. Kimberly submitted no evidence to the contrary. Indeed, Kimberly does not acknowledge in her argument that David paid only $7,000 for the license during the marriage. Despite referencing David's testimony that the seat license had a value of $0, the court recognized that the license came with benefits and expenses. The court assigned David future costs associated with maintaining the license. It also instructed that David pay Kimberly 50% of the face value of the remaining tickets. There was not an obvious or singular way to distribute this asset and, while this particular asset may have been resolved in David's favor, other assets, like the safety deposit box, may have been resolved against David. Regardless of the court's reference to David's testimony of a value of $0, we see no abuse of discretion in its overall handling of the license and tickets nor in its overall property distribution.

¶ 128                           5. David's Parents as Necessary Parties

¶ 129          Kimberly argues, for the first time on appeal, that the trial court's ruling with respect to payment for college was not a complete determination of the controversy, because David's parents had not been joined as necessary parties. Kimberly contends that, if David's parents were added as necessary parties, she could determine whether the college accounts owned by David's parents contained marital funds, in the form of gifts from David during the marriage.

43

¶ 130    "A necessary party is one whose participation is required to (1) protect its interest in the subject matter of the controversy which would be materially affected by a judgment entered in its absence; (2) reach a decision protecting the interests of the parties already before the court; or (3) allow the court to completely resolve the controversy." (Internal quotation marks omitted.) *Black as Trustee of Black v. Black*, 2024 IL App (1st) 221667, ¶ 48. Kimberly did not raise the issue below, but a claim that the court has failed to add a necessary party may be raised at any time, by any party, including *sua sponte* by the appellate court. *Id.* ¶ 47. We decline to do so. We agree with David that questions concerning David's gifts to his parents would have been something to ascertain through discovery of the parties' financial records, possible subpoena of the grandparents, and testimony at trial.

¶ 131                                  6. Disability Policy

¶ 132    Finally, Kimberly summarily argues that the trial court abused its discretion in failing to award her any portion of the value of the two Paul Revere disability policies that David had disclosed on his financial affidavit. David did not assign a value to the policies in the financial affidavit, and he testified at trial that he believed he would be required to be working as a market maker at the CBOE to be eligible for any benefits. The trial court found, and both parties accept, that David has not worked at the CBOE since 2011. Kimberly does not further develop her argument regarding the Paul Revere disability policies or cite authority. It is, therefore, forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 133                                  III. CONCLUSION

¶ 134    The judgment of the circuit court of Du Page County is affirmed.

¶ 135    Affirmed.

44